1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10   MANUEL ENRIQUEZ,               )    NO. EDCV 09-1284-CT
                                    )
11            Plaintiff,            )    OPINION AND ORDER
                                    )
12        v.                        )
                                    )
13   MICHAEL J. ASTRUE,             )
     Commissioner of               )
14   Social Security,              )
                                    )
15                                  )
              Defendant.            )
16   _____)
                                    )
17

18        For the reasons set forth below, it is ordered that judgment be

19   entered in favor of defendant Commissioner of Social Security ("the

20   Commissioner") because the Commissioner's decision is supported by

21   substantial evidence and is free from material legal error.

22                        SUMMARY OF PROCEEDINGS

23        On July 31, 2009, Manuel Enriquez ("plaintiff"), filed a complaint

24   seeking judicial review of the denial of benefits by the Commissioner

25   pursuant to the Social Security Act ("the Act").  On October 19, 2009,

26   plaintiff filed a brief with points and authorities in support of

27   reversal or remand.  On December 14, 2009, the Commissioner filed a

28   memorandum in support of defendant's answer.

### SUMMARY OF ADMINISTRATIVE RECORD

1.  Proceedings

On February 26, 2007, plaintiff filed applications for disability insurance benefits and Supplemental Security Income ("SSI"), alleging disability since June 1, 2005 due to a left ankle injury, nerve damage, and breathing problems.  (TR 83-89, 109.)[1]  The applications were denied initially and upon reconsideration.  (TR 39-43, 47-51.)

On October 16, 2007, plaintiff filed a request for a hearing before an administrative law judge ("ALJ").  (TR 53.)  On January 8, 2009, plaintiff, represented by an attorney, appeared and testified before an ALJ.  (TR 23-28.) The ALJ also considered the testimony of plaintiff's girlfriend, (TR 28-30), and of a vocational expert ("VE") (TR 30-33.)

On April 13, 2009, the ALJ issued a decision that plaintiff was not disabled, as defined by the Act, and thus not eligible for benefits in part because, "in [plaintiff's] estimation," he remains able to perform a limited range of light level work.[2]  (TR 8-19.)  On April 24, 2009, plaintiff filed a request with the Social Security Appeals Council to review the ALJ's decision.  (TR 4.)  On June 15, 2009, the request was denied.  (TR 1-3.)  Accordingly, the ALJ's decision stands as the final decision of the Commissioner.  Plaintiff subsequently sought judicial review in this court.

---

[1]   "TR" refers to the transcript of the record of administrative proceedings in this case and will be followed by the relevant page number(s) of the transcript.

[2]   Under the Act, light work is defined as involving: "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . ."  20 C.F.R. §§ 404.1567, 416.967.

2.   <u>Summary Of The Evidence</u>

The ALJ's decision is attached as an exhibit to this opinion and order and materially summarizes the evidence in the case.

<u>PLAINTIFF'S CONTENTIONS</u>

Plaintiff essentially contends the ALJ failed to:

1.   Properly consider the treating physician's opinion regarding plaintiff's physical residual functional capacity ("RFC")[3];

2.   Properly consider the treating physician's opinion regarding plaintiff's mental RFC;

3.   Properly consider the lay witness' statements and testimony; and

4.   Pose a complete hypothetical to the vocational expert.

<u>STANDARD OF REVIEW</u>

Under 42 U.S.C. §405(g), this court reviews the Commissioner's decision to determine if: (1) the Commissioner's findings are supported by substantial evidence; and, (2) the Commissioner used proper legal standards. <u>Macri v. Chater</u>, 93 F.3d 540, 543 (9th Cir. 1996). Substantial evidence means "more than a mere scintilla," <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971), but less than a preponderance. <u>Sandgathe v. Chater</u>, 108 F.3d 978, 980 (9th Cir. 1997).

When the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, however, the Court may not substitute its judgment for that of the Commissioner. <u>Flaten v. Secretary of Health and Human Services</u>, 44 F.3d 1453, 1457 (9th Cir. 1995). The court has the authority to affirm, modify, or reverse the

_____

[3]   The RFC is the most, and not the least, an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks. 20 C.F.R. §§ 409.1545, 416.945.

Commissioner's decision "with or without remanding the cause for rehearing."   42 U.S.C. §405(g).

DISCUSSION

1.   The Sequential Evaluation

A person is "disabled" for the purpose of receiving social security benefits if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

The Commissioner has established a five-step sequential evaluation for determining whether a person is disabled.   First, it is determined whether the person is engaged in "substantial gainful activity."   If so, benefits are denied.

Second, if the person is not so engaged, it is determined whether the person has a medically severe impairment or combination of impairments.   If the person does not have a severe impairment or combination of impairments, benefits are denied.

Third, if the person has a severe impairment, it is determined whether the impairment meets or equals one of a number of "listed impairments." If the impairment meets or equals a "listed impairment," the person is conclusively presumed to be disabled.

Fourth, if the impairment does not meet or equal a "listed impairment," it is determined whether the impairment prevents the person from performing past relevant work.   If the person can perform past relevant work, benefits are denied.

Fifth, if the person cannot perform past relevant work, the burden

4

1  shifts to the Commissioner to show that the person is able to perform
2  other kinds of work.  The person is entitled to benefits only if the
3  person is unable to perform other work.  20 C.F.R. §§ 404.1520, 416.920;
4  Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

5      2.  Issues

6          A.  Treating Physician's Opinion (Issues #1 and #2)

7      Plaintiff first contends the ALJ failed to provide legally
8  sufficient reasons for rejecting the physical and mental RFC evaluations
9  provided by plaintiff's treating physician, Edward B. Hai, M.D., (TR
10  263-64, 266-68).

11     Although, in general, the Social Security Administration favors the
12  opinion of a treating physician over that of a non-treating physician,
13  an ALJ may discredit treating physicians' opinions that are conclusory,
14  brief, and unsupported by the record as a whole, or by objective medical
15  findings.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). In
16  doing so, the ALJ must provide "specific and legitimate reasons"
17  supported by substantial record evidence.  Rollins v. Massanari, 261 F.3d
18  853, 856 (9th Cir. 2001) (citation omitted).  The ALJ can meet this
19  burden by "'setting out a detailed and thorough summary of the facts and
20  conflicting clinical evidence, stating [any] interpretation thereof, and
21  making findings.'"  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir.
22  2008)(citation omitted).

23     The ALJ amply satisfied these standards here.

24     Based upon an extensive review of the medical record, including the
25  reports and RFC findings of the consultative examining physician and
26  psychiatrist, plaintiff's own assessment of his abilities, and the RFC
27  forms Dr. Hai filled out at the behest of plaintiff's attorney, the ALJ

28

articulated multiple specific and legitimate reasons for finding Dr. Hai's conclusions were entitled to no evidentiary weight.  Specifically, that Dr. Hai:

- Proposed highly restrictive mental and physical functional limitations, which are contradicted by the independent findings of the consultative examining physician and psychiatrist, who opined mild and no limitations, respectively, (compare TR 263-64, 266-68 with TR 163-67, 224-30);

- Did not support his physical RFC assessment with reference to medical findings.  Indeed, the doctor, nonsensically, stated that his assessment was supported by the fact that plaintiff had been prescribed Motrin, TID, Claritin Cold, Singulair, and an inhaler (TR 267);

- Indicated, also nonsensically, that plaintiff's ability to reach, handle, finger, push, and pull were affected by plaintiff's left leg pain (TR 267);

- Did not offer any medical basis in either assessment that would support the conclusion that plaintiff would be absent from work more than three times per month (TR 263-64, 266-68);

- Opined "moderate" limitations in all realms of plaintiff's mental functioning referred to on the form, yet identified no mental diagnosis and offered no explanation for the limitations he described (e.g., TR 263-64);

- Did not refer plaintiff for mental healthcare, according to a review of the record, despite opining that he had moderate limitations in all areas of mental functioning and notwithstanding the fact that the doctor's facility offers mental health treatment;

- Did not prescribe any psychotropic medication for plaintiff, according to a review of the record, notwithstanding his purported opinion that plaintiff had moderate limitations in all areas of mental functioning.

(See TR 13-14.)

These findings are supported by substantial evidence of record and are legally sufficient reasons for the ALJ to decline to give weight to the mental or physical RFC assessments provided by Dr. Hai.[4]  Although plaintiff claims the ALJ should have contacted Dr. Hai to ascertain the basis for his conclusions, the ALJ has a duty to develop the record only when the evidence is ambiguous or inadequate to support a determination. Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ did not find Dr. Hai's reports to be ambiguous, he found them not to be credible or supported by the objective medical findings.  (See TR 13-14.)

Additionally, though plaintiff is correct that the ALJ did not specifically address and discount Dr. Hai's opined environmental limitations, at an earlier point in the opinion the ALJ found plaintiff had no such limitations on the bases that his asthma, described by physicians as "mild," is controlled by medication and plaintiff alleges

---

[4]  Moreover, among the many reasons the ALJ cited for finding plaintiff not to be entirely credible, he noted that plaintiff has admitted to regular alcohol and methamphetamine use, making inconsistent statements in that regard. (E.g., TR 17, 256.) To the extent plaintiff's drug and alcohol use play a role in any mental limitations, a plaintiff is not considered to be disabled if alcoholism or drug addiction is a "contributing factor" material to the Commissioner's determination that plaintiff is disabled.  42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J) (2001).

1   no limitations in this regard.  (See TR 12-13, 187, 188, 191, 258.)  Not
2   only are these independent and legally sufficient reasons to decline to
3   credit this portion of Dr. Hai's findings, see 20 C.F.R. §§ 404.1530
4   (a), 416.930 (a) (providing that social security plaintiff must follow
5   prescribed treatment if it can restore the ability to work), the ALJ is
6   not required to address and discount cumulative evidence, Magallanes v.
7   Brown, 881 F.2d 747, 755 (9th Cir. 1989).

8          There is no material legal error here.

9          B.   Lay Witness Testimony (Issue #3)

10          Plaintiff next argues the ALJ failed to consider physical and
11   mental limitations that plaintiff's sister described in an unsworn
12   third-party function report.[5]

13          The sworn statements of "friends and family members in a position
14   to observe [plaintiff's] symptoms and daily activities have routinely
15   been treated as competent evidence."  Sprague v. Bowen, 812 F.2d 1226,
16   1232 (9th Cir. 1987).   While an ALJ should consider even unsworn
17   statements submitted by non-parties familiar with a plaintiff's
18   limitations, see Schneider v. Commissioner, 223 F.3d 968, 974-75 (9th
19   Cir. 2000), the ALJ may discount even the sworn testimony of a lay
20   witness based upon reasons that are "germane" to that witness, Crane v.
21   Shalala, 76 F.3d 251, 254 (9th Cir. 1996)(citation omitted).

22          The mere fact that a witness is a family member, alone, does not
23   constitute a germane ground to reject the lay witness's testimony
24   wholesale. See Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996). An

25   _____

26          [5]  Notably, plaintiff does not challenge the ALJ's finding
27   that the sworn testimony of plaintiff's girlfriend was not
    entirely credible.  (TR 17.)

28                                    8

ALJ may, however, reject a lay witnesses statements if the ALJ finds the witness to be biased.  E.g., Greger v. Barnhart, 464 F.3d 968, 972-73 (9th Cir. 2006) (the fact that girlfriend's "close relationship" with plaintiff "possibly" influenced her desire to help him was a germane reason to disregard her sworn affidavit). Other reasons "germane" to a particular witness may include that the witness's testimony is contradicted by the medical evidence of record or the plaintiff's own assessment of his or her limitations, Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005), or that the witness has made contradictory or inconsistent statements, e.g., Lewis v. Apfel, 236 F.3d 503, 512 (9th cir. 2001).

Here, the ALJ explicitly adopted all of the physical limitations to which plaintiff testified at the hearing and adopted the unsworn statement of plaintiff's sister to the extent it was consistent with plaintiff's own testimony. (TR 15, 17.) To the extent it conflicted with plaintiff's own testimony, however, he declined to credit those portions of the sister's report that proposed greater limitations in plaintiff's ability to ambulate and to perform daily tasks. This would constitute a germane reason for the ALJ to reject even sworn testimony, and is likewise a sufficient basis to discount an unsworn report. See Bayliss v. Barnhart, 427 F.3d at 1218. The ALJ also declined to entirely credit the sister's statement because the ALJ believed she was understandably biased in wanting to help her brother. (See TR 17.) This is likewise a germane reason. Greger v. Barnhart, 464 F.3d at 972-73.

Furthermore, to the extent plaintiff's sister indicated plaintiff has mental limitations – concentration difficulties and difficulties handling stress – the ALJ specifically rejected such limitations in

discussing plaintiff's claimed limitations.  The ALJ found that any such limitations conflict with plaintiff's behavior at the consultative psychiatric examination and the findings of the consultative examiner (see TR 224-30), and on the basis that a concentration limitation is inconsistent with plaintiff's statements regarding his activities, such as playing cards (e.g., TR 143.)  Again, the ALJ is not required to repeatedly address and discount cumulative evidence. Magallanes v. Brown, 881 F.2d at 755.

There is no material legal error here.

C.    Vocational Expert Hypothetical (Issue #4)

Last, plaintiff contends the ALJ did not pose a complete hypothetical to the VE because he omitted the mental limitations opined by Dr. Hai, which were discussed above.

As was discussed above, however, the ALJ articulated legally sufficient reasons for giving no weight to the mental limitations proposed by Dr. Hai and, consequently, he was not obliged to include those limitations in the VE hypothetical. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (a proper hypothetical question may exclude limitations which the ALJ finds do not exist based on substantial evidence).

Moreover, the court has reviewed the record and finds that the ALJ articulated legally sufficient reasons, based upon substantial evidence of record, for finding that any mental limitations plaintiff claims are mild and would have no more than minimal impact on his ability to perform basic mental work activities. (See TR 14.)  Specifically, as the ALJ found, the medical record indicates that plaintiff did not seek or receive psychiatric treatment.  Indeed, the consultative examining

psychiatrist found <u>no</u> limitations in plaintiff's mental functioning. He assessed plaintiff with a global assessment of functioning score of 70, which suggests "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> p. 32 (4th ed. 1994 (DSM-IV)). (<u>See</u> TR 229.)   The ALJ may properly exclude from the hypothetical any mental limitations that have been found to be "mild" and present "no significant interference" with work abilities. <u>See</u> <u>Desrosiers v. Sec'y of Health & Human Servs.</u>, 846 F.2d 573, 577 (9th Cir. 1988) (existence of minor non-exertional, e.g., mental, impairment precludes use of Medical-Vocational Guidelines only if it will "significantly limit" plaintiff's work abilities).

There is no material legal error here.

CONCLUSION

If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner.   <u>Flaten v. Sec'y of Health and Human Services</u>, 44 F.3d at 1457.

After careful consideration of the record as a whole, the magistrate judge concludes that the Commissioner's decision is supported by substantial evidence and is free from material legal error.

//

//

//

//

11

1  Accordingly, it is ordered that judgment be entered in favor of the

2  Commissioner.

3  DATED: 12/23/09

4  _____
   CAROLYN TURCHIN
5  UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    12

**SOCIAL SECURITY ADMINISTRATION**
**Office of Disability Adjudication and Review**

DECISION

**IN THE CASE OF**

Manuel Villegas Enriquez, Jr.
(Claimant)

(Wage Earner)

**CLAIM FOR**

Period of Disability, Disability Insurance
Benefits, and Supplemental Security Income

███████████
(Social Security Number)

## JURISDICTION AND PROCEDURAL HISTORY

On February 5, 2007, the claimant filed a Title II application for a period of disability and disability insurance benefits. The claimant also filed a Title XVI application for supplemental security income on February 5, 2007. In both applications, the claimant alleged disability beginning June 1, 2005. These claims were denied initially on June 4, 2007, and upon reconsideration on August 31, 2007. Thereafter, the claimant filed a written request for hearing on October 16, 2007 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*).

The claimant appeared and testified at a hearing held on January 8, 2009, in San Bernardino, California. Joseph M. Mooney, an impartial vocational expert, also appeared at the hearing. The claimant is represented by Bill Latour, an attorney.

## ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2010. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

## SUMMARY OF DECISION

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from June 1, 2005 through the date of this decision.

**8**

See Next Page



Manuel Villegas Enriquez, Jr. ███████████

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521 and 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

**9**

See Next Page



Manuel Villegas Enriquez, Jr. (5█████████)                                   Page 3 of 12

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f) and 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g), 404.1560(c), 416.912(g) and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

1.   **The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.**

2.   **The claimant has not engaged in substantial gainful activity since June 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

3.   **The claimant has the following severe impairments:  a remote history of fractured left femur, status-post open reduction and internal fixation (1989) and hardware removal (1990), a left ankle injury in 2006 with avascular necrosis to portions of the left talus and navicular, status-post arthroscopic left ankle surgery in July 2008 (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*). The claimant also has non-severe physical impairments, including a history of right ankle strain for which was treated conservatively, mild asthma, hypertension, and obesity.**

**The claimant has no severe mental impairments but has been diagnosed with an adjustment disorder and alcohol abuse.**

The medical records disclose the claimant fractured his left femur in the remote past. He underwent open reduction and internal fixation for the fracture in 1989 and later had surgery for



removal of the hardware in 1990 (Ex. 1F/1). However, after the surgery, he was able to return to his past work in construction, which involved a heavy to very heavy level of exertion.

The claimant was seen for complaints referable to his right foot in 2005. In May 2005, he presented with right foot pain after a twisting injury two weeks prior (Ex. 5F/22, 28, 29). Magnetic resonance imaging taken of the right foot on September 30, 2005, was significant for diffuse bone marrow edema involving the talar, midfoot, and bones of the metatarsals, suggestive of osteomyelitis, and clinical correlation was recommended (Ex. 5F/41, 35, 24). In October 2005, he was assessed with right ankle pain. Although it was thought he might have osteomyelitis, the appearance of the right ankle was much better than the MRI reading. The physical examination revealed no tenderness, erythema, or deformity of the ankle (Ex. 5F/16). He was given an orthopedic referral and a disability form for three months (Ex. 5F16). On orthopedic referral in November 2005, he was simply assessed with right foot pain (Ex. 5F/15). On orthopedic follow-up in December 2005, care remained conservative, with advice to continue wearing high top boots and continue symptomatic care, and a prescription for Naprosyn (Ex. 5F/14). Nerve damage was to be ruled out. In February 2006, he was referred for physical therapy for a right ankle strain injury (Ex. 5F/12). In March 2006, the diagnosis remained right ankle strain (Ex. 5F/10). In sum, he received conservative care for a right ankle strain injury that resolved in less than twelve consecutive months.

The claimant testified his left ankle pain began in mid-2006. The records disclose he was seen on November 19, 2006, complaining of left ankle pain after he reportedly injured his left ankle while digging (Ex. 5F/9). Diagnostic imaging taken of the left foot on November 19, 2006, showed soft tissue swelling without evidence of fracture and only mild degenerative changes at the talonavicular joint (Ex. 5F/40). In December 2006, physical examination revealed a gait favoring the left side, some swelling, and mild tenderness to palpation (Ex. 5F/5). In May 2007, the diagnosis remained left ankle sprain with a plan for physical therapy and prescriptions for Naprosyn and Ultram for pain (Ex. 5F/4). Though he continued to complain of ankle pain, range of motion of the left ankle was full (Ex. 5F/2, 3). It was not until July 31, 2007, that magnetic resonance imaging showed avascular necrosis to portions of the left talus and navicular (Ex. 10F/9). Treatment remained conservative in 2007 (Ex. 10F). The claimant testified that he had physical therapy for a brief period in 2008 and that he had surgery to the left ankle in October 2008. A September 2008 progress note reflects the claimant was status-post left ankle surgery in July 2008 and was under the care of a physical therapist (Ex. 14F/10). An October 2008 progress note reflects that he was doing well on follow-up and that he was status post left foot surgery with left foot pain (Ex. 14F/4). A left foot x-ray was ordered in October 2008, but there are no further treatment records (Ex. 14F/3). The claimant testified that he was scheduled for hardware insertion on January 28, 2009, and he provided an appointment confirmation for some type of orthopedic surgery to be performed on January 28, 2009 (Ex. 13F). The claimant testified that the only medication prescribed for his pain is 800 milligrams of ibuprofen, taken five times per day, with some reported benefit.

The claimant has a history of asthma, which has been described as mild, and has been prescribed an albuterol inhaler (Ex. 5F/6, 10, 20, 27; 10F/9). However, few respiratory abnormalities have been noted on examination, such as occasional wheezing (Ex. 5F/7, 12; 10F/6). Moreover, the condition has been adequately controlled with prescribed inhalers with no emergency room visits

**11**



Manuel Villegas Enriquez, Jr. ████████                    Page 5 of 12

or hospitalizations for asthma exacerbations. Nor has the claimant asserted any limitations due to the condition. Hence, this impairment is not severe.

The claimant also has a history of hypertension that has been under adequate control with prescribed treatment. He was noted to have good pulses and good capillary refill (Ex. 5F/27). Hence, this impairment is not severe.

The claimant has also been diagnosed with obesity (Ex. 14F/19). However, the records do not establish a severe weight problem. There are no weight measurements in the treatment records. He reported a height of 69 inches and a weight of 185 pounds, which computes to a BMI of 27.3. At the consultative examination, he weighed 189, only a few pounds more than he first reported. The claimant has alleged no limitations due this condition. Nor has the record established any limitations. Hence, this impairment is not severe.

On April 20, 2007, the claimant underwent consultative examination by Bunsri Sophon, M.D., a board-certified orthopedic surgeon, at the request of the Agency (Exhibit 1F). The claimant complained of left ankle pain. The claimant reported current medications as Tramadol, Gabapentin, Naproxen, Furosemide, and Sulfa. The claimant admitted to drinking two 24-ounce beers per week.

Physical examination was unremarkable, except for a non-disfiguring, non-tender 5-millimeter scar over the left greater trochanter area, and moderate swelling with localized tenderness over the deltoid ligament on the left ankle.

Otherwise, examination was essentially normal. It was noted that the claimant was in no acute distress and had no difficulty moving about the examining room. He was alert and oriented with good memory function and calm mood and behavior. The claimant was 67 inches tall and weighed 189 pounds, which computes to a body mass index (BMI) of 29.59. Blood pressure was normal at 120/80. Grip strength was 20 pounds in the right non-dominant hand and 60 pounds in the left dominant hand. Gait was normal too, though he demonstrated difficulty standing on his toes and could perform only 25% of a squat. Range of motion was full in all joints, without deformity, effusion, or edema. All muscles were of normal strength and tone, and without atrophy, tenderness, or spasm. Thigh circumference was 45 centimeters, bilaterally, and calf circumference was 38 centimeters, bilaterally (Ex. 1F/2). Deep tendon reflexes were normal and symmetric. Lumbar flexion was normal, without tenderness or spasm. Straight leg raising was negative bilaterally. There were no focal motor or neurological deficits, and sensory testing was unremarkable.

Dr. Sophon diagnosed old fracture left femur, status post IM nailing and removal of nail and chronic left ankle sprain. Dr. Sophon opined that the claimant could lift and carry ten pounds frequently and twenty-five pounds occasionally; and could sit for six hours per workday, stand or walk for four hours per workday.

A non-examining medical consultant for the State Agency, John Hartman, M.D., a family practitioner, also described limitations consistent with light work activity with occasional postural limitations (Exs. 2F and 3F). A second non-examining medical consultant for the State



Manuel Villegas Enriquez, Jr. ███████                                Page 6 of 12

Agency, F. Kalmar, M.D., a specialist in Physical Medicine, concurred in the assessment (Ex. 8F).

The fill-in form entitled *Medical Opinion re: Ability to Do Work-related Activities (Physical)* completed by Edward Hai, M.D., has also been considered (Ex. 12F). Dr. Hai indicated the claimant was limited to less than two hours of standing and walking, to less than two hours of sitting, and to lifting and carrying less than ten pounds on a frequent basis. However, in the space where he was asked to identify the medical findings to support these limitations, he simply indicated the claimant had been prescribed Motrin, 800 milligrams, TID, Claritin Cold, Singulair Cold, and an Albuterol inhaler (Ex. 12F). He also indicated that reaching, handling, fingering, feeling, pushing, and pulling were limited, but his explanation is nonsensical. He indicated these functions are affected by left heel, ankle, and knee pain, and then indicated that degenerative joint disease and obesity supported his finding. He further indicated the claimant was precluded from heavy lifting and frequent walking, which appear to be reasonable limitations given the claimant's impairments. He anticipated the claimant would be absent from work more than three times per month, but he offered no medical basis for his conclusion. On the contrary, it appears that he did not give much thought to the form and simply checked every listed area as impaired. His conclusions are highly unpersuasive, particularly in light of the form he completed concerning the claimant's mental capacity, as discussed later in this finding. His conclusions are rejected to the extent they are inconsistent with the above-adopted residual functional capacity.

Considering the combined effect of the claimant's severe and non-severe impairments, the claimant has never been deprived of the residual functional capacity for a limited range of light work, with the limitations he testified to having, for a continuous period of twelve months. There is no evidence that the arthroscopic surgery in 2008 resulted in disability beyond the short time required for convalescence. Nor is there any evidence the surgery proposed for January 2009 resulted in an inability to perform sustained work activity for a continuous twelve-month period.

From a mental perspective, there are no mental health treatment records. The claimant denied hospitalizations and or outpatient mental health treatment (Ex. 6F/2). He also denied taking any psychiatric medications.

On August 19, 2007, the claimant underwent consultative examination by Sohini Parikh, M.D., a board-eligible psychiatrist, at the request of the Agency (Exhibit 6F). The claimant complained of depression. He denied the use of street drugs, but he admitted to drinking alcohol, about a six-pack of beer per week (Ex. 6F/2).

Mental status examination was unremarkable, except for depressed mood. The claimant was alert and oriented, and there was no evidence of hallucinations, delusions, thought broadcasting or withdrawal, or ideas of reference. Speech was unremarkable, and no psychomotor agitation or slowing was noted. Digit span was four digits forward and three backwards. Simple calculations were intact, and the claimant was able to perform serial 7's. The claimant was able to recall the name of the current president. Similarity and differences testing was intact, as was interpretation of proverbs. Insight and judgment were intact too.

**13**

See Next Page



Manuel Villegas Enriquez, Jr. ████████                    Page 7 of 12

Dr. Parikh diagnosed a mood disorder and alcohol abuse. He gave a global assessment of functioning (GAF) of 70, indicating mild symptomatology (DSM-IV, p. 32). Dr. Parikh opined that the claimant had no impairment in the ability to reason or in the ability to make social, occupational, or personal adjustments. More specifically, he found no impairment in the ability to understand, remember and carry out complex instructions; interact with others; respond appropriately to usual work situations; or deal with changes in a routine work setting.

A non-examining medical consultant for the State Agency, H. Amado, M.D., a psychiatrist agreed that the claimant's mental impairments were not severe (Ex. 7F).

The checkbox form entitled *Work Capacity Evaluation (Mental)* completed by Edward Hai, M.D., has also been considered (Ex. 11F). Dr. Hai indicated the claimant had moderate limitations in all functional areas addressed on the form and that he expected the claimant would miss, on average, three or more days from work due to his impairments. However, Dr. Hai identified no mental diagnoses, and he offered no explanation for the limitations he described. On the contrary, it appears that he did not give much thought to the form and simply checked every listed area as moderately impaired. His conclusions are highly unpersuasive in that it does not appear that he ever conducted a mental status examination and certainly never referred the claimant for mental healthcare, though such care was available through Arrowhead Regional Medical Center. Nor did he prescribe any psychotropic medication. Furthermore, the limitations he described are contradicted by the assessments of Dr. Parikh and Dr. Amado. Consequently, his conclusions are rejected.

The claimant's medically determinable mental impairments of adjustment disorder and alcohol abuse do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

The claimant had the following degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings in 20 CFR, Part 404, Subpart P, Appendix 1: no restriction in activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration.

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

**4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).**

**14**

See Next Page



Manuel Villegas Enriquez, Jr. ████████                           Page 8 of 12

No physician has opined that the claimant's condition meets or equals any listing, and the State Agency physicians opined that it does not. Nor does the medical evidence of record contain clinical or laboratory findings that satisfy the criteria of any listed impairment.

**5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as that term is defined in 20 CFR 404.1567(b) and 416.967(b), except that the claimant has been limited to standing for fifteen to twenty minutes at a time, walking for thirty minutes at a time, sitting for two hours at a time, and lifting thirty pounds at a time.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

The claimant alleged a disability commencing June 1, 2005, due to a left ankle injury, nerve damage, and breathing problems (Ex. 3E). He asserted that he could hardly walk due to pain in his left knee, as of June 1, 2005, but that he did not stop working until September 1, 2006. He reported that he ultimately stopped working due to ankle pain. He described a typical day to include showering, feeding his pets, eating meals, watching television, cleaning the house, taking a nap, and going to bed (Ex. 9E/1). He also indicated that his sister helped him with some of his chores and that he had difficulty with some of his personal care due to pain and difficulty standing. However, he indicated that he could prepare his own meals when his sister was not around (Ex. 9E/3). Although he indicated that his sister did most of the housework, he admitted that he did sweeping, dusting, and some laundry for fifteen minutes at a time, and that he could grocery shop for two to three hours at a time (Ex. 9E/3).

The claimant testified that he has problems with pain in his right hip, left knee, and both ankles. He is unbalanced and has problems with concentration due to pain. He is also depressed. He indicated that he broke his left leg in 1989 or 1990, and that he hurt his left ankle in the middle of 2006. He stopped working after he hurt his ankle in 2006. He had physical therapy for his left ankle in 2008 for about two months, at a frequency of twice a week. He indicated he had arthroscopic surgery to his left ankle in September or October 2008, and that surgery was planned for his left heel in January 2009. The claimant testified that he is taking only Motrin, 800 milligrams, for pain and has been taking it for about six months or so. He takes it every day, about five tablets a day. The medicine helps with the pain but does not completely relieve it.

In the claimant's estimation, he can stand for fifteen to twenty minutes, walk for thirty minutes, sit for one to two hours, and lift at most thirty pounds.

He does not drive and has not had a license since 1996. He watches a lot of television. His income is welfare and food stamps.

The claimant's girlfriend, Genevieve Armendarez, testified that she sees him every day, and she stays there sometimes. She said that she helps him sometimes in the morning. She indicated that

**15**

See Next Page



he has problems with pain and concentration and that he has to lie down during the day. She is unemployed and receives food stamps.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant initially alleged that he became disabled on June 1, 2005, yet he admitted that he continued working until mid-2006, or for about a year after he contends that he became disabled and unable to work (Exs. 1D and 2D).

The claimant's testimony concerning his inability to work due to pain, depression, and concentration problems is unpersuasive in light of the objective medical evidence of record. Even with a residual functional capacity that includes his self-assessed limitations for standing, sitting, walking, and lifting, sustained work activity is not precluded. Rather, the claimant would be capable of performing a significant but limited range of light work as identified by the vocational expert and discussed in the finding below.

The claimant's pain medication is not commensurate with the degree of limitation alleged. The claimant testified his only prescribed medication is ibuprofen, 800 milligrams, which he takes five times per day with some benefit. Considering the vast array of more potent medications in the analgesic armamentarium, it is obvious the treating physicians consider this much milder regimen of medications sufficient.

On orthopedic consultative examination, the thigh and calf muscles of the left leg were equal in size to the same muscles of the right leg, indicating no disuse atrophy and normal use of the lower extremities in his activities of daily living (Ex. 1F/2).

The claimant's self-described daily activities, as he related them to Dr. Parikh are consistent with the limitations adopted above (Ex. 6F/3). He lives alone, manages his own funds, cares for his

**16**



Manuel Villegas Enriquez, Jr. ███████████                    Page 10 of 12

personal grooming and hygiene, watches television, cares for his dog, and does light household chores, sometimes with the assistance of his sister (Ex. 6F/3). He reported no difficulty with completion of his household tasks.

Despite his alleged concentration difficulties, he demonstrated no such difficulties at the consultative psychiatric evaluation. Rather, he was able to focus attention and follow simple oral and written instructions (Ex. 6F/3). He also reported that he enjoys playing cards, an activity requiring sustained concentration (Ex. 9E/5).

The claimant has made inconsistent statements concerning his alcohol and drug use, minimizing his use of alcohol and denying his use of street drugs to the examiners for the State Agency (Exs. 6F/3, 1F/2). However, he admitted to his medical provider that he drank two 24-ounce beers per day and that he used methamphetamines once per week (Ex. 10F/4). Such misrepresentations bear poorly upon his credibility.

Consequently, the claimant's allegations as to his pain, limitations and activities, are considered credible to the extent they are consistent with the residual functional capacity above, which incorporates his self-described abilities as per his testimony at the hearing.

The third party statements of the claimant's sister have also been considered in this case (Ex. 8E). Her representations as to the claimant's activities and functional limitations are similar to those described by the claimant. As his sister, she understandably wants to assist him with his application for benefits. However, she has made inconsistent statements concerning his ability to walk. In one instance, she reported that she helps him with the cooking because he cannot stand for more than ten minutes, but she later indicated that he goes shopping for two to three hours at a time (Ex. 8E/2, 4). Her statements are rejected to the extent they are inconsistent with the residual functional capacity, the claimant's self-described limitations.

Similarly, the undersigned has considered the testimony of the claimant's girlfriend as to his pain and concentration difficulties. As her statements simply mirror those of the claimant, they have been afforded the same weight for the reasons set forth above.

In sum, the above residual functional capacity assessment is supported by the claimant's own testimony. The functional capacity assessments of Drs. Sophon, Hartman, Kalmar, Parikh, and Amado also support a residual functional capacity for a significant range of light work activity. The more restrictive assessments of Dr. Hai are rejected for the reasons set forth earlier in this decision.

**6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

The vocational expert classified the claimant's past relevant work as a cement mason as semi-skilled work performed at a heavy to very heavy level of exertion. When asked to consider a hypothetical individual with the above-adopted residual functional capacity, the vocational expert opined that such an individual would be unable to perform the claimant's past relevant work. Accordingly, having considered the demands of the claimant's past relevant work in light

**17**

See Next Page



of the above-adopted residual functional capacity, the undersigned adopts the vocational expert's persuasive analysis and so finds.

**7.   The claimant was born on September 25, 1963 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8.   The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has non-exertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or non-exertional limitations (SSRs 83-12 and 83-14). If the claimant has solely non-exertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18 and 202.19. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative unskilled light occupations, such as a hand packager, table worker, bench assembler, or counter clerk with in excess of 5,000 jobs available in the regional economy. According to the vocational expert, all of these jobs can be learned in thirty days or less with on-the-job training and simple demonstration, and they can be performed primarily in a seated position with minimal amounts of walking and standing.

**18**

See Next Page



Manuel Villegas Enriquez, Jr. ▓▓▓▓▓▓▓                           Page 12 of 12

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

## DECISION

Based on the application for a period of disability and disability insurance benefits filed on February 5, 2007, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on February 5, 2007, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.


/s/ *F. Keith Varni*
_____
F. Keith Varni
Administrative Law Judge


April 13, 2009
_____
Date


**19**


EXHIBIT